# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No.: 1:09-CR-88 |
| | ) | |
| JEFFREY D. CREWS | ) | |

## OPINION AND ORDER

This matter is before the court on the motion to suppress filed by the defendant, Jeffrey D. Crews ("Crews") on April 30, 2010 (docket at 33). The Court held an evidentiary hearing on the motion on May 25, 2010 and ordered further briefing from the defendant and the government. Crews filed his brief in support of his motion on July 8, 2010 (docket at 41) and the government filed its response in opposition on August 6, 2010 (docket at 42). Crews's reply brief was due on August 23, 2010, but his counsel advised the Court Clerk that he did not deem a reply brief necessary. Thus, the motion is now ripe for resolution. For the reasons discussed herein, the motion to suppress is DENIED.

## DISCUSSION

Crews was indicted on four counts of distribution or possession with intent to distribute cocaine base, or "crack." Indictment, docket at 9. He entered a not guilty plea and filed the present motion to suppress in which he "denies that he was involved in any illegal activity and contends that no probable cause existed for his arrest. Additionally, Crews contends that the search of his vehicle was improper based upon *Arizona v. Gant*, 129 S.Ct. 1710 (2009)." Motion to Suppress, p. 1. Crews also argues "that statements made by him to the police were the product of his illegal detention and arrest and should, likewise, be suppressed." *Id*. The government contends that police conducted several "controlled buys" of crack cocaine from Crews on

separate occasions and that police had ample cause to stop Crews's vehicle and arrest him. Government's Response, p. 1.

Crews was arrested on August 20, 2009, by officers of the Fort Wayne Police Department. Police stopped the car Crews was driving on that date and arrested him based on evidence gathered during a weeks-long drug trafficking investigation. During the hearing on Crews's motion to suppress, the Court heard the testimony of Darrick Engelman, a veteran detective with the FWPD. Tr., pp. 4-61. In July of 2009, Engelman began working with a confidential informant ("CI") who allegedly had personal knowledge of Crews's drug trafficking activity. *Id*., p. 7. Engelman had the CI set up several controlled buys of crack cocaine from Crews. *Id*., p. 8. The first such drug buy took place on July 20, 2009. *Id*. Engelman testified that on that date he met with the CI, performed a thorough "strip search" of the informant, "fitted [him] with an audio recording device for his safety and for evidence purposes[.], [and] provided [him] with recorded U.S. currency to complete the transaction." *Id*., p. 9. The CI then called Crews and set up a time to meet him for the purpose of conducting a drug transaction. *Id*. This transaction was scheduled to take place at the informant's residence. *Id*. Police searched the informant's residence prior to the drug transaction taking place and found no contraband of any sort in the home. *Id*., p. 10. According to Detective Engelman, Crews arrived at the informant's home in a Ford F150 truck driven by another individual, went inside, and sold the informant approximately seven grams of crack cocaine. *Id*., pp. 9 and 13. Meanwhile, Engelman and other detectives were conducting surveillance of the informant's residence during this controlled buy. *Id*., p. 13. After this controlled buy was completed, police officers "tailed" the Ford truck and observed it make "two immediate stops, two stops right after the controlled drug transaction.

2

Both stops were of known drug houses where Mr. Crews was seen exiting the truck for a very short period of time, and then returning to the truck." *Id.*, p. 15. Detective Engelman explained that this sort of activity is "very consistent with what you would call re-upping a drug house." *Id.* Engelman explained that based on his extensive experience with drug investigations, he had reason to believe that Crews may have been supplying drugs to these drug houses. *Id.*, pp. 15-16. Engelman directed a patrol officer to follow the truck and conduct a traffic stop. *Id.*, p. 14. Officer Mark Bieker did so and in the process was able to identify Crews as the passenger in the truck. *Id.* Crews, however, was not arrested at this point.

On July 27, 2009, Engelman and the CI made arrangements for a second controlled buy of crack from Crews. *Id.*, p. 19. This time, the transaction was to take place at another location. The CI drove to the location, an apartment on the City's southeast side, in his own vehicle while Engelman followed in an unmarked police car. *Id.*, p. 20. A second police officer arrived before the CI and was conducting surveillance. *Id.*, p. 21. Engelman testified that once the CI arrived at the designation location, "[h]e exited his vehicle, went to the front door, made contact with the defendant. . . . The money was exchanged. And the informant immediately left. It was a very short transaction." *Id.* Engelman followed the CI to another location where the CI handed Engelman the drugs he allegedly had just purchased from Crews. *Id.*, p. 22. Detective Engelman conducted a post-buy search of the CI and field tested the substance, which tested positive for cocaine. *Id.* Moments after this transaction, officers conducting surveillance at the apartment saw Crews exit the apartment and drive away in a white Cadillac. *Id.*, p. 23. Police obtained the license plate number on the Cadillac and discovered that it was registered to Crews's mother. *Id.*; *see also*, Government's Exhibits 2 and 10.

The next controlled buy occurred on August 6, 2009. *Id.*, p. 26. On this occasion, Detective Engelman conducted a pre-buy body search of the CI and searched the CI's residence as well. *Id.* Engelman testified that this third controlled buy took place almost exactly in the way the first one did–with the CI making the arrangements by telephone and Engelman conducting pre-buy searches and supplying prerecorded buy money. *Id.*, pp. 26-27. Shortly after the CI called Crews, Crews arrived at the CI's residence, entered it, and left very quickly. *Id.*, p. 27. On this occasion, officers conducting surveillance were able to see Crews approach the CI's residence and were able to identify him. *Id.*, pp. 27-28. Crews was driving a white Cadillac on this occasion also. *Id.*, p. 28.

Finally, on August 20, 2009, Engelman had the same CI arrange for another drug purchase from Crews. *Id.*, p. 30. This transaction took place at a residence on Oakwood Drive in Fort Wayne. *Id.*, p. 31. The CI drove to this residence while Engelman followed him. *Id.* Police had been conducting occasional surveillance of this residence since the date of the first controlled buy and had noticed a white Cadillac at the home on several occasions. *Id.*, p. 32. The CI pulled into the driveway of the home and Crews exited the home and got into the passenger side of the CI's vehicle. *Id*, p. 33. Officers conducting surveillance of the transaction were able to identify Crews. *Id.* An audio recording was made of this transaction and Engelman testified that "[u]pon listening to the audio recording device, you can hear the defendant advising the informant" that he was delivering a full ounce of crack cocaine, packaged in three separate plastic bags. *Id.*[1]

---

[1] Each of the three prior controlled buys involved the purchase of a quarter ounce of crack.

Immediately after this fourth controlled buy, Engelman followed the CI to conduct his post-buy search and obtain possession of the crack. *Id.*, p. 34. Engelman had also instructed other officers near the scene to follow Crews, who was driving the white Cadillac, to conduct a traffic stop, and to arrest Crews on suspicion of drug trafficking. *Id.*, p. 35. Engelman heard over the police radio that the stop and arrest had been made and Crews had been transported to police headquarters. *Id.* It is undisputed that officers did not have a warrant when they stopped and arrested Crews. The audio recordings of each controlled buy were admitted into evidence at the hearing without objection. *Id.*, p. 39. After Crews was transported to police headquarters he was interviewed by FWPD officers and by officers of the Drug Enforcement Administration. *Id.* A videotape of this interview was also admitted into evidence. *Id.*, p. 42.

During the hearing in this case, the Court also heard the testimony of FWPD Officer Jean Gigli, who works in the department's Vice and Narcotics Division. *Id.*, pp. 61-75. Officer Gigli helped conduct surveillance during several of the controlled buys allegedly involving Crews. *Id.*, p. 63. Gigli and another officer, Angie Reed, followed Crews and conducted a traffic stop a short distance from the site of the fourth and final controlled buy. *Id.*, p. 65. Undercover officers had been following Crews but Gigli and Reed conducted the stop and arrest since they were in full police uniforms. *Id.* Gigli and Reed had a description of the white Cadillac and the license plate number of the vehicle. *Id.* This stop and arrest were recorded by Gigli's in-car video camera and the video was admitted into evidence. *Id.*, p. 68. After stopping Crews, Gigli performed a "pat-down" search of the suspect and discovered "an odd-shaped lump in his–bulge in his front, left pocket." *Id.*, pp. 70-71. The bulge turned out to be a bag containing crack cocaine. *Id.*, p. 71. Gigli also discovered a large amount of cash on Crews's person. *Id.* As a

5

result of this drug trafficking investigation and the controlled buys, Crews was indicted in this case.

In his brief, Crews argues that "[t]he only issue in this case is Crews' contention that there was not probable cause for his arrest." Defendant's Brief, docket at 41, p. 3. Crews argues that the alleged drug buys on July 20 and August 6, 2009, did not provide probable cause for arrest since they were "dependent upon the report of the confidential informant, along with the audio-recording. Police officers did not observe any transaction." *Id*. Crews also argues that the drugs that he allegedly sold to the CI on those occasions "could have [been] secreted somewhere in the house or that someone else may have been there." *Id*., pp. 3-4. In support of this latter argument, Crews points out that Engelman, on cross-examination, admitted that he did not search every possible place in the CI's residence where drugs could have been hidden. *Id*; *see also*, Tr., p. 49. Crews also argues that "[t]he informant was someone who obviously had experience in selling drugs and it would be reasonable to assume that the informant may very well have had drugs hidden on the premises. It is also reasonable to assume that the informant would have been willing to falsely incriminate Crews in order to work himself out of the charges against him for selling drugs." *Id*., p. 4. Finally, Crews notes that since Detective Engelman "had never personally talked with Crews[.] . . . he is unable to identify any voice on the audio-recording as being that of Defendant Crews. . . . Because of this, Crews maintains that there was no probable cause for his detention and arrest and the subsequent search of himself and his car was improper under the Fourth Amendment." *Id*.

The government counters by arguing that there was more than ample evidence to support probable cause for the arrest and detention of Crews. Government's Response, docket at 42, p.

6

9. The government argues that "[t]he CI's credibility and reliability were established through his previous successful track record; furthermore, the CI's information was significantly corroborated by the audio recordings, the controlled buys, and the independent observations of police." *Id*. The government correctly points out that a warrantless arrest of an individual "is consistent with the Fourth Amendment if the arrest is supported by probable cause. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) . . . The necessary inquiry is not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest. [*United States v.] Watson*, 423 U.S. [411,] 417 [(1976)]. When a lawful arrest is made, an arresting officer may search the person of the arrestee, and the area within his immediate control, for any weapons or evidence. *Chimel v. California*, 395 U.S. 752, 762-63 (1969)." *Id*. The government also points out, correctly once again, that police may conduct a search of arrestee's vehicle if they have reason to believe the vehicle contains evidence of the offense for which the individual is being arrested. *Id*. (citing *Arizona v. Gant*, 129 S.Ct. 1710, 1721 (2009)).

In ruling on the legality of a warrantless arrest, a court must assess the issue of probable cause in light of the totality of the circumstances to determine whether police had sufficient knowledge of the facts and circumstances that would lead them to believe a crime had been committed. "[D]etermining whether probable cause exists involves a 'practical, common-sense decision whether, given all the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Ellis,* 499 F.3d 686, 689 (7th Cir. 2007) ( *quoting United States v. Hines,* 449 F.3d 808, 814 (7th Cir. 2006)). "'Probable cause is a fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances' known at the time the event

7

occurred." *Id.* at 689 (*quoting United States v. Breit,* 429 F.3d 725, 728 (7th Cir. 2005)). The events leading up to an arrest are viewed from the standpoint of an objectively reasonable police officer. *Ornelas v. U.S.,* 517 U.S. 690, 696 (1996).

As for Crews's argument that the CI in this case was not reliable, or that probable cause could not have been based on the evidence provided by the CI, that argument fails also. Confidential informants are commonly used and are often an essential tool in the fight against drug trafficking. Also, where police have reason to believe a CI is reliable (as in this case, where the CI assisted other FWPD officers in a drug investigation) and, most importantly, where evidence provided by the CI is corroborated (as it was here with audio tapes and personal observations by police surveillance officers), evidence provided by a CI can supply probable cause for the arrest of a suspect. *See, e.g.*, *United States v. Dismuke*, 593 F.3d 582, 587 (7th Cir. 2010); *United States v. Mays*, 593 F.3d 603, 608 (7th Cir. 2010); *United States v. Taylor*, 522 F.3d 731, 735 (7th Cir. 2008).

In the present case, police had more than ample probable cause to arrest Crews. In fact, during the hearing on Crews' motion to suppress, this Court even remarked, while ruling on one of the defendant's objections to the admission of certain evidence, that "[t]his may be the most completely documented series of events leading–as a basis for arrest that I've ever seen." Tr., p. 41. Indeed, police had a wealth of evidence–both direct and circumstantial–tying Crews to drug trafficking activity in the weeks prior to his arrest *and* on the very day of his arrest. They set up controlled buys with a confidential informant that police had previously deemed reliable. They had audio recordings of those controlled buys. Police officers conducting surveillance during the controlled buys personally observed Crews at the scenes, and knew that he drove a white

8

Cadillac registered to his mother. They observed Crews going into known drug houses on more than one instance. On the day of his arrest, he had just left the last of four controlled buys set up by police, was observed by police surveillance units leaving the scene of that controlled buy, was stopped and arrested. The audio tapes corroborate the extremely detailed testimony of three police officers as to the events leading up to Crews's arrest. The Court found the testimony of Detective Engelman and Officers Gigli and Reed to be completely credible. Crews was arrested after a thorough drug trafficking investigation spanning several weeks. This investigation provided ample probable cause for his arrest even in the absence of a warrant.

## CONCLUSION

For the reasons discussed above, the motion to suppress filed by defendant Jeffrey Crews is DENIED.

Date: September 21, 2010.

    /s/   William C. Lee
William C. Lee, Judge
United States District Court
Northern District of Indiana